**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION**
Case No. 5:20-cv-00042-KDB-DSC

EARL COOK,

          Plaintiff,

v.

UNITED PARCEL SERVICE, INC.,

          Defendant.

_____

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

Defendant UNITED PARCEL SERVICE, INC. ("UPS" or "Defendant"), by its attorneys

and pursuant to Rule 56 of the Federal Rules of Civil Procedure and LR 7.1, hereby submits

Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment.

**I.     INTRODUCTION**

While at home on July 15, 2017, Plaintiff Earl Cook suffered a stroke that paralyzed the

right side of his body, required multiple skull surgeries, and hospitalized him for over a month.

Thereafter, Cook experienced intermittent debilitating seizures.

According to Cook's sworn April 2018 statements to the Social Security Administration,

he was "unable to work because of [his] disabling condition on July 15, 2017" and was "still

disabled." (Cook Dep. Ex. 6.) Cook was deemed totally disabled by the Social Security

Administration as of July 15, 2017 and has received full social security disability insurance

payments since January 2018. Cook also obtained a federal student loan discharge on March 6,

2020, based upon his sworn January 9, 2020 representation (made three months before this case

was filed) that he has "a total and permanent disability." (Cook Dep. Ex. 28, 29.)

Cook's April 2018 sworn statements to obtain social security disability payments include that he could not perform essential functions of his UPS preload supervisor job, including the requirement to lift up to 70 pounds. (Cook Dep. Ex. 1.) These sworn factual admissions foreclose essential elements of his disability accommodation and discrimination claims, namely that he is a qualified individual with a disability who could perform all essential functions of his job with or without accommodation. Moreover, Cook's sworn statements for social security disability payments judicially estop his claims under the ADA and North Carolina law.

Notwithstanding Cook's factual admissions foreclosing essential prima facie elements and giving rise to claim precluding judicial estoppel, UPS reasonably accommodated Cook. Cook was afforded medical leave starting on July 15, 2017, the day of his initial stroke. In April 2018, after Cook began applying for social security claiming total disability, he attempted to return to work without advance notice or following UPS's reinstatement procedures. UPS then engaged in the ADA interactive process, which included medical inquiries to Cook's doctors and discussions with Cook (and his girlfriend, who wrote Cook's answers due to his physical limitations). Cook's doctor imposed a 20-pound lifting restriction that was incompatible with the essential function that Cook be able to lift up to 70 pounds. On June 14, 2018, it was determined that Cook could not perform all essential functions of his preload supervisor job with or without accommodation. UPS then conducted a six-month job search for Cook. Cook requested that the job search be limited to the small Wilkesboro, NC UPS facility. Cook was notified that his employment would be terminated if no job was found in the six-month search period.

Human Resources was unable to identify any open positions within Cook's medical and geographic restrictions during the job search period, and Cook did not apply for any jobs himself. On December 27, 2018, Cook's employment was administratively terminated.

2

For these reasons, and as discussed in detail below, UPS did not fail to accommodate Cook or discriminate against him because of a disability, and UPS is entitled to summary judgment on all claims.

## II. STATEMENT OF FACTS

### A. UPS promoted Cook to preload supervisor in January 2015, where he supervised and trained loaders.

Earl Cook began working for UPS on September 2014 as a loader at the Wilkesboro, NC facility. (Earl Cook Deposition ("Cook Dep.") 20:18-21:4.) The Wilkesboro facility is a small UPS facility, with approximately 88 employees and 10 supervisor positions. (Ebony Truzy Declaration ("Truzy Dec.") ¶ 3.)

As a loader, Cook was responsible for picking up packages from a belt and placing them onto trucks. (Cook Dep. 21:2-22:15.) Loaders were required to lift packages up to 70 pounds unassisted. (Cook Dep. 22:12-15.) According to Cook, about one third of packages to be loaded weighed over 20 pounds. (Cook Dep. 23:3-7.) In January 2015, Cook was promoted to part-time preload supervisor. (Cook Dep. 20:20-21:4.) Cook was then responsible for supervising 11 employees, including six loaders, in the Wilkesboro facility. (Cook Dep. 44:1-24.)

### B. The essential functions of Cook's preload supervisor job required him to lift up to 70 pounds.

UPS's written job description for a preload supervisor requires the supervisor to be able to lift, carry, and pull up to 70 pounds. (Cook Dep. 110:4-113:10, Ex. 7 at 9-10.) In Cook's experience as a preload supervisor, there were numerous situations in which he needed to move packages. Packages came down the belt towards the loaders at the wrong angle a "couple of times a day." (Cook Dep. 28:12-29:15.) When this happened, Cook or a loader reached onto the belt to move the package and avoid a blockage. *Id.* Cook also assisted loaders by removing

3

leaking, broken, and damaged packages from the belt, gathering loose items, and taking the package and loose items to be repacked.  (Cook Dep. 47:3-48:10, 59:8-60:13, 160:15-161:24.)  The weight of these items varied based on what was in the package.  (Cook Dep. 47:3-48:10.)  Cook knew that in an emergency situation, such as if a loader were caught on a belt, he would need to remove the loader from the belt.  (Cook Dep. 49:2-50:2.)

Cook's preload supervisor responsibilities also included training new loaders by picking up packages and demonstrating proper loading methods.  (Cook Dep. 56:15-58:4.)  And, when the facility's package loading rate fell behind, Cook loaded packages himself.  (Cook Dep. 227:20-228:12.)  In Cook's words: "If I didn't do it, then the sort would fail, meaning that drivers wouldn't get out on time."  (Cook Dep. 228:14-17.)  According to Cook, if not enough loaders reported to work, Cook loaded packages onto trucks the entire day.  (Cook Dep. 229:6-25.)

As a preload supervisor, Cook worked on the desktop computer upstairs to check the speed of the belt and the productivity of the loaders, and to complete paperwork.  (Cook Dep. 36:7-37:5.)  Cook's knowledge of the productivity data for loaders helped him to ensure that work was done on time.  (Cook Dep. 51:2-15.)  On average, Cook used the computer ten times per day.  (Cook Dep. 50:16-51:1.)  The Wilkesboro facility also contained two computers downstairs, which were used for USPS mail sort functions and for hourly employees to clock in and out.  (Cook Dep. 37:21-38:2.)

Cook documented some of his preload supervisor job duties in the Work History Report that Cook submitted to the Social Security Administration on April 22, 2018, as part of his application for social security disability payments.  (Cook Dep. 19:8-20:15, Ex. 1.)  Cook wrote that he "had to fill in for employee bathroom breaks by loading and unloading trucks often lifting packages up to 70 lbs."  (*Id.*, Ex. 1 at 2.)  He stated that, in his 5.5 hour daily shift, he spent four

hours walking and standing; three hours handling, grabbing or grasping big objects; two hours reaching; and one hour sitting, climbing, stooping, kneeling, crouching, and handling small objects. *Id.* In explaining his lifting and carrying, Cook wrote "lifted packages of varying weight and size. Carried between 1ft and 30ft over 100 times per day." *Id.*

### C. Cook suffered a stroke in July 2017 and was hospitalized for over a month.

On July 15, 2017, while at home, Cook suffered a stroke. (Cook Dep. 65:9-66:7.) Cook was airlifted to Baptist Hospital in Winston-Salem and stayed there for over a month, until August 22, 2017. *Id.* To relieve swelling, Cook's doctors drilled a hole in his skull and later removed part of his skull. (Cook Dep. 66:14-67:1.)

After the stroke, Cook suffered four intermittent seizures. (Cook Dep. 68:25-69:4.) The first occurred in February 2018 and caused him to fall out of his chair at home and lose consciousness. (Cook Dep. 67:20-68:6 ("the lights just cut off … I just went out")). Another seizure occurred on July 4, 2018 when he was a church cookout. (Cook Dep. 142:2-19.) He was standing in line at the cookout, and he next remembered waking up in a hospital. *Id.* Cook's most recent seizure occurred at his home in 2020. (Cook Dep. 68:20-69:7.)

### D. UPS engaged in the interactive process to determine if Cook could perform the essential functions of a preload supervisor or other available position with or without reasonable accommodation.

Cook was placed on a medical leave of absence after his stroke. (Cook Dep. 120:25-121:8, Ex. 11.) Cook was approved for paid disability benefits from July 15, 2017 through January 12, 2018.[1] (Truzy Dec. ¶ 5.) Cook did not provide additional information for an extension of these benefits. (Truzy Dec. ¶ 5.) Following his first seizure in February 2018, on March 7, 2018, Cook initiated a second short-term disability claim and was approved for benefits

---

[1] Cook exhausted his 12-week FMLA entitlement on October 9, 2017. (Truzy Dec. ¶ 4.)

PD.31268099.1

from January 13, 2018 through July 13, 2018.  (Cook Dep. 120:25-121:8, Ex. 11; Truzy Dec. ¶ 5.)

On April 2, 2018, Cook texted On-Road Supervisor Mickey Wall (a peer who was not Cook's supervisor):  "I was just going to show up.  Aetna said to call them when I go back so they can put me in the system.[2]  Only problem is . . . I can't drive.  Or fully work my right side. But we're working on that. … Fake it till I make it, right?"  (Cook Dep. 146:4-13, Ex. 17; Truzy Dec. ¶ 7.)  During his deposition in this case, Cook admitted that the plan he discussed with Wall was to fake full use of the right side when attempting to return to work.  (Cook Dep. 151:16-21.)

On April 3, 2018, the UPS Human Resources Service Center sent Cook a letter informing him of his options to return to work.  (Cook Dep. 78:18-79:7, Ex. 5.)  It stated "please keep in mind that UPS offers job-related accommodations for persons who are disabled within the meaning of the Americans with Disabilities Act (ADA).  If you believe that you have an ADA-covered disability and are interested in requesting an ADA accommodation at this time, please contact the UPS Human Resources Service Center to obtain the necessary paperwork." *Id.*  The letter also informed Cook that under the UPS Flexible Benefits Summary Plan Description, employees who are absent from work for 12 months would be administratively terminated.  *Id.*

On April 4, 2018, Cook allegedly went to the Wilkesboro facility and purportedly gave Chuck Ford a doctor's note with his medical restrictions.  (Cook Dep. 81:1-20, 205:7-25, Ex. 31.)  In fact, Chuck Ford was terminated in January 2018 and did not work at UPS in April 2018.

---

[2] Cook purportedly received an unidentified letter from Aetna stating that he "needed to call" Aetna before returning to work and that he planned to call the morning he attempted to go back to work.  (Cook Dep. 149:10-19.)  As of April 2, 2018, Cook had a short-term disability benefit claim with Aetna regarding his seizures.  (Truzy Dec. ¶ 5.)  Cook testified that he "really didn't understand nor did I try to figure out what kind of things were running concurrently." (Cook Dep. 147:24-25.)

PD.31268099.1

(Cook Dep. 116:15-117:9; Truzy Dec. ¶ 8.)  Nevertheless, Cook admittedly did not request any accommodations from Ford.  (Cook Dep. 98:6-9.)  Cook told no one at UPS about his medical restrictions.  (Cook Dep. 97:15-19.)

Cook went to the Wilkesboro facility on April 5, 2018, planning to work without having any discussions with UPS about his medical restrictions.  (Cook Dep. 88:10-89:3.)  Cook did not call Aetna, HR, or the HRSC before going to the Wilkesboro facility on April 5.  (Cook Dep. 97:15-19, 152:18-25.)  That day, Nancy Bailey, the manager of the Wilkesboro facility, was working at another facility that she managed in Lenoir, NC.  (Bailey Dep. 24:20-24.)  As was her usual practice when working in Lenoir, Bailey called On-Road Supervisor Mickey Wall in the morning on April 5th to check in on the Wilkesboro facility, and Wall told Bailey about Cook's weight restrictions.  (Bailey Dep. 25:20-26:10.)  Bailey told Wall that Cook could not work because of his weight restriction.  (Bailey Dep. 26:6-10.)  It was Bailey's understanding that Cook stopped working shortly after her conversation with Wall.  (Bailey Dep. 26:11-16.)  Unbeknownst to Bailey, Cook did not comply with the direction to stop working and kept working the rest of the work day.  (Cook Dep. 93:3-13; Bailey Dep. 31:2-16.)

On April 11, 2018, Cook initiated an accommodation request, and UPS sent Cook a request for medical information form to be completed by his doctor.  (Truzy Decl. ¶ 6.)  Cook's medical inquiry form, completed by his own doctor, stated that Cook could not lift, carry, or pull greater than 20 pounds due to his hemorrhagic stroke, and craniectomy with residual right sided hemiparesis.  (Cook Dep. 102:3-104:20, Ex. 7 at 2.)  Cook's restrictions were "of unknown permanence."[3]  *Id.* at 3.

---

[3] In an Attending Provider Statement that Cook's doctor completed on April 20, 2018 and submitted to Aetna for Cook's short-term disability claim, she identified similar lifting

On May 15, 2018, UPS held an ADA checklist meeting for Cook. (Cook Dep. 123:22-125:1, Ex. 12.) UPS Human Resources Manager Kendra Coates and Occupational Health Supervisor Sharon Klinger attended the meeting. (Cook Dep. 114:4-15.) Cook and his girlfriend, Larisa Ashe, also attended the meeting. (Cook Dep. 122:4-123:11.) Ashe drove Cook to the meeting because Cook could not drive, and Ashe filled out the accommodations checklist form during the meeting, because Cook could not write. *Id.* In the accommodations checklist form, Cook had Ashe write that he was "unable to lift, carry, pull more than 20 lbs" and "unable to climb ladders, bend, squat repetitively." (Cook Dep. 123:22-125:1, Dep. Ex. 12 at 1.) The accommodations Cook believed would allow him to perform the essential functions of the preload supervisor position were "a job working downstairs and assistance with packages over 20 lbs."[4] *Id.* Cook said that he would only consider jobs within the Wilkesboro facility. (*Id.* at 1-2.) He was asked if he would be willing to work at a different facility and he said he was not. (Cook Dep. 131:9-16.)

Cook also proposed an accommodation of reassignment to package data supervisor. (Cook Dep. Ex. 12. at 2-4.) There is only one package data supervisor position in the Wilkesboro facility and that position was filled by David Massucco from March 1, 2007 to May 30, 2020. (Truzy Dec. ¶ 9.) This position also has the same lifting requirements as the preload supervisor and, consequently, Cook could not perform the essential functions of the position. (Ex. 12 at 1; Truzy Dec. ¶ 10.)

---

restrictions and also said that Cook had "limited fine motor skills" and could not climb stairs or ladders safely. (Cook Dep. 113:11-114:3, Ex. 8.)

[4] The day after the checklist meeting, on May 16, 2018, Cook texted UPS employee, Lane Harris, that he had proposed to Coates that the physical labor required for the preload supervisor position should be shifted entirely on the other preload supervisor position, specifically that "there is another sup and he could do the lifting." (Cook Dep. 153:1-156:21, Ex. 18.)

8

After the checklist meeting, Coates contacted Bailey, and Bailey told Coates that:

> [Cook] was a good employee that just had a stroke and she wanted to get him back to work but that she didn't have anything … it was a bittersweet conversation because she said she didn't have anything that he could do at that point in time and that there wasn't a person that was leaving out of that Data Supervisor position, that was a desk job that he could have done.

(Coates Dep. 51:24-52:9.)  Bailey told Coates that the preload supervisor is "a physical job … if you don't have enough people, that [sic] you get in there and load if you have to."  (Coates Dep. 52:10-16.)  Coates documented that Cook could not be accommodated in his current position and there were no open positions that he could perform.  (Cook Dep. Ex. 12 at 3-5; Coates Dep. 52:17-20.)

On June 14, 2018, UPS extended Cook's leave by six months, during which time UPS and Cook could search for open positions that he could perform the essential functions of with or without reasonable accommodations.  (Cook Dep. 133:13-134:4, Ex. 13.)  Over the six month job search period, Cook searched for open positions within UPS and did not submit a single application.  (Cook Dep. 134:19-135:15.)  Coates' replacement as of July 2018, HR Manager Ebony Truzy, also looked for open positions for Cook during this period; however, none were identified.  (Truzy Dec. ¶ 11.)  On December 27, 2018, Cook's employment was administratively terminated because he had been absent from work for more than 12 months.  (Cook Dep. 225:18-226:3, Ex. 32.)

### E. Cook's 20-pound lifting restriction remained through his December 2018 termination.

Cook did not submit to UPS any medical information about his condition or restrictions after April 2018 for the ADA interactive process.  (Truzy Dec. ¶ 6.)  Meanwhile, in furtherance of short-term disability payments, on June 22, 2018, Cook's doctor submitted an Attending Provider Statement to Aetna that Cook's medical restrictions had not changed.  (Cook Dep.

PD.31268099.1

138:5-18, Ex. 14.)  Cook was "unable to lift/carry/pull greater than 20 lbs"; had "limited fine

motor skills (grasp)" and he could not climb ladders or stairs safely.  *Id.*

On July 4, 2018, Cook suffered his second seizure.  (Cook Dep. 142:4-6.)  On July 16,

2018, Cook's doctor wrote in Cook's file after an office visit, "[a]t this stage is still not well

controlled with his seizures and I think he should not be returning to work."  (Cook Dep. 140:16-

141:16, Ex. 15.)  Cook never sought a second opinion regarding his ability to return to work.

(Cook Dep. 143:13-16.)  On July 23, 2018, Cook's doctor submitted additional documentation to

Aetna, writing "[t]he patient is unable to work until re-evaluated in December."  (Cook Dep.

143:24-144:18, Ex. 16 at 3.)

On September 30, 2018, while still employed by UPS, Cook filed for unemployment

insurance.  (Cook Dep. 167:13-168:3, Ex. 20.)  In Cook's application for unemployment

benefits, he told the North Carolina Division of Employment Security that he was unable to work

due to his medical limitations.  (Cook Dep. 169:5-22, Ex. 20.)  In the Division of Employment

Security's determination, it said "Claimant filed a claim effective 09/30/2018. The claimant has

indicated he/she applied for or received benefits based on a disability. It has been established that

the disability pay is in fact based on a total disability.  Accordingly, it is determined claimant is

unable to work during the time period indicated."  (Cook Dep. Ex. 20 at 2.)

### F.    Cook's claimed total disability to the Social Security Administration and the Department of Education.

From March 2018 through January 2020, Cook submitted several documents disclaiming

his ability to perform all essential job functions of his preload supervisor position or any other

job to the Social Security Administration and to the Department of Education for permanent

disability payments and student loan forgiveness.  None of these documents were submitted to

UPS as part of the ADA process.  (Truzy Dec. ¶ 6.)

10

Cook initially filed an application for social security disability benefits on March 9, 2018. (Cook Dep. 74:20-75:13 & Ex. 4.)  He then claimed that he had been unable to work since July 15, 2017.  (Cook Dep. 85:13-87:24, Ex. 6.)

In addition to the April 22, 2018 Work History Report disclaiming the ability to perform the essential 70 pound lifting requirement, *see supra* Part II.B, Cook submitted a Physical Medical Source Statement completed by his doctor to the Social Security Administration on July 20, 2018 in support of his disability insurance claim.  (Cook Dep. 175:24-177:4, Ex. 22.)  Cook's doctor stated that Cook had right sided weakness and that this impairment was expected to last at least 12 months.  *Id.*  He further stated that Cook must use a cane or other hand-held assistive device while walking because of imbalance, weakness, and insecurity; could occasionally lift 20 pounds and never lift 50 pounds; was expected to be off task 20% of the work day; could not engage in fine manipulations of his right hand fingers or reach his right arm overhead; and that he was incapable of even low stress work due to uncontrolled seizures.  *Id.*

On August 8, 2018, Cook submitted a Function Report to the Social Security Administration where Cook wrote that he was limited in his ability to work because "[r]ight hemiparesis impairs balance, ability to write, and ability to pick up and move heavy objects." (Cook Dep. 171:12-172:21, Ex. 21.)  Additionally, in explaining his medical limitations, Cook stated that he "cannot drive due to right hemiparesis, need to be watched due to seizures"; he said that he did not follow spoken instructions well; had a limited ability to follow written instructions; that he could only walk 4 blocks before needing to rest; he needed to "avoid stress to avoid seizure risk"; and wrote the following about his limitations:

> lifting 20 lbs, balance affects my ability to squat, kneel, bend, stand, reach, walk, sit, and climb stairs; cognitive deficits cause problems with talking, memory, completing tasks, concentration, and getting along with others.  Right sided hemiparesis make it difficult to use right arm and hand

*Id.* In Cook's deposition, he stated that at the time that he "didn't feel comfortable being out in public" and that he was "dragging [his] leg around." (Cook Dep. 173:25-174:10.)

On September 28, 2018, Cook requested a hearing before an administrative law judge concerning his request for social security benefits, stating that his "impairments prevent me from working and restrict my activities." (Cook Dep. 177:25-178:14, Ex. 23.)

More than eight months after Cook's termination, on September 13, 2019, at the hearing in front of the administrative law judge for Cook's social security benefits, Cook testified "that he has difficulty picking up and holding items, he cannot write or use a screw driver, and has trouble with balance because he cannot feel his right leg." (Cook Dep. 180:3-23, Ex. 24 at 2.) The judge found that Cook was unable to perform any past relevant work, including as a "supervisor in logistics," based on the testimony of Cook's vocational expert, who "testified that a person of the claimant's age, educational background, work experience, and residual functional capacity could not meet the demands of these jobs." *Id.* at 3. The judge additionally found that "there are no jobs that exist in significant numbers in the national economy that the claimant can perform." *Id.*

Cook was awarded monthly social security payments based on the administrative law judge's determination that he had been disabled under the Social Security Act since July 15, 2017. (Cook Dep. Ex. 24 at 5.) Cook's award of monthly payments began January 2018, and he continued to receive those payments as of the date of his deposition. (Cook Dep. 185:2-187:23.)

On January 9, 2020, Cook submitted an application for discharge of his student loans based on total and permanent disability. (Cook Dep. 191:11-195:6, Dep. 28.) In this application, Cook certified that he has a total and permanent disability. *Id.* Cook's application contains a physician certification from Dr. Crowell, which states that Cook has a physical impairment that

prevents him from engaging in any substantial gainful activity and is expected to last for at least 60 months. *Id.* Dr. Crowell wrote that Cook has "lifelong complications - limited ability to use hands, walk, sit, stand;" that Cook "can only stand for 30 minutes @ a time, sit for up to 1 hour, walk up to 15 minutes @ a time;" and that Cook does not drive. *Id.* Cook's application was successful and on March 6, 2020 his student loans, $30,470, were discharged based on his total and permanent disability. (Cook Dep. 195:7-15, Ex. 29.)

## III.    STANDARD OF REVIEW

On a motion for summary judgment, the movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." *Dash v. Mayweather*, 731 F.3d 303, 310–11 (4th Cir. 2013) (quoting Fed. R. Civ. P. 56(a)). "Once the moving party has met that burden, the non-moving party must come forward and demonstrate that such an issue does, in fact, exist." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). To meet its burden, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash*, 731 F.3d at 311.

## IV.    ARGUMENT

### A.    Cook's ADA claim fails because Cook is not a qualified individual.

There being no direct evidence of discrimination in this case, the familiar *McDonnell Douglas* framework is applicable to Cook's claims. *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005). *See also Fields v. Verizon Servs. Corp.*, 493 F. App'x 371, 375 (4th Cir. 2012) (applying *McDonnell Douglas* framework to the ADA). For disability discrimination predicated on failure to accommodate, Cook must first prove the prima facie elements "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he

13

could perform the essential functions of the position . . .; and (4) that the [employer] refused to make such accommodations." *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013). Once a plaintiff makes this *prima facie* case, "the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its adverse employment decision." *Laber v. Harvey*, 438 F.3d 404, 430 (4th Cir. 2006). "If the defendant satisfies this burden, the presumption disappears and the plaintiff must show that the articulated reason is a pretext for [] discrimination." *Id.*

"The ADA defines a 'qualified individual with a disability' as 'an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Lamb v. Qualex, Inc.*, 33 Fed. Appx. 49, 55 (4th Cir. 2002) (quoting 42 U.S.C. § 12111(8)). Cook must prove that he is a qualified individual with a disability for a *prima facie* case of ADA discrimination or failure to accommodate. *Wilson*, 717 F.3d at 345; *EEOC v. Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 377 (4th Cir. 2000).

### 1.    Cook is not a qualified individual because he was unable to meet the 70-pound lifting requirement of the preload supervisor position with or without accommodation.

For Cook to establish that he is a qualified individual, Cook must prove that he could perform the essential functions of a preload supervisor with or without reasonable accommodation. *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 278–79 (4th Cir. 2004). This Cook cannot do because he was unable to meet the 70-pound lifting requirement for the preload supervisor position. "A job function is essential if it 'bear[s] more than a marginal relationship to the job at issue.'" *Id.* (quoting *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994)). "[I]f an employer has prepared a written description before

advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). "Other relevant evidence can include 'the employer's judgment as to which functions are essential,' 'the amount of time spent on the job performing the function,' 'the consequences of not requiring the incumbent to perform the function,' and the work experience of people who hold the same or similar job." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 579 (4th Cir. 2015) (quoting 29 C.F.R. § 1630.2(n)(3)). "An employer's judgment regarding the essential functions of its job is considered 'highly probative.'" *Rudolph v. Buncombe Cty. Gov't*, 846 F. Supp. 2d 461, 474 (W.D.N.C. 2012) (citation omitted).

UPS's job description for the preload supervisor position contains a lifting requirement of lifting, carrying, and pulling of up to 70 pounds. (Cook Dep. 112:17-113:10, Ex. 7 at 9-10.) During his deposition, Cook testified that in his personal experience, there were numerous instances where, as preload supervisor, he would need to be able to lift and carry packages, including when they are damaged and the preload supervisor needs to remove the damaged box and items that were contained in the box; when a package is not positioned correctly on the belt and a preload supervisor needs to reach onto the belt to remove it; and in the course of training new loaders. (Cook Dep. 29:2-15, 47:3-48:10.) Cook further testified that preload supervisors were expected to help out loading packages when the loading rate fell behind or when an insufficient number of loaders showed up to work that day and that "it was almost required;" if he "didn't do it, then the sort would fail, meaning that drivers wouldn't get out on time." (Cook Dep. 228:14-17.) Bailey similarly testified about the importance of a preload supervisor being able to load packages, including for safety training of loaders and to assist loaders when they fall behind in loading their trucks. (Bailey Dep. 41:12-42:9.)

PD.31268099.1

Similarly, in the Work History Report Cook submitted to the Social Security Administration, Cook described his job as including "[h]ad to fill in for employee bathroom breaks by loading and unloading trucks often lifting packages up to 70 lbs." (Cook Dep. Ex. 1 at 2.) He also said that he spent three hours a day handling big objects "lift[ing] packages of varying weight and size … over 100 times per day," and up to 70 pounds *Id.* In the Function Report Cook submitted to the Social Security Administration, Cook said that he was limited in his ability to work because "[r]right hemiparesis impairs … ability to pick up and move heavy objects." (Cook Dep. Ex. 21.)

In sum, UPS's job description contains a lifting requirement up to 70 pounds; Cook testified in his deposition about the numerous reasons he needed to lift packages of varying weights as a preload supervisor and the essential nature of doing so; and Cook stated to the Social Security Administration as part of his application for benefits that part of his job was lifting packages, at times he would need to lift over 100 packages per day, and he lifted up to 70 pounds. It thus cannot be disputed that lifting packages up to 70 pounds is an essential function of a preload supervisor. *See Jacobs*, 780 F.3d at 579. *See also E.E.O.C. v. Womble Carlyle Sandridge & Rice, LLP*, 616 F. App'x 588, 595 (4th Cir. 2015) ("because so many facets of the SSA job may at any time require lifting over 20 pounds, the ability to do so 'bear[s] more than a marginal relationship to the job,' and is thus an essential function of the position").

> ### 2. Due to the medical limitations from Cook's stroke and subsequent seizures, he cannot lift over 20 pounds.

Since Cook's stroke and subsequent surgery and seizures, Cook has had a lifting restriction of 20 pounds. (Cook Dep. 203:1-10; Dep. Ex. 7, 12.) Cook's medical inquiry form, completed by his own doctor to submit to UPS as part of the interactive process, stated that Cook could not lift, carry, or pull greater than 20 pounds due to his hemorrhagic stroke, and

16

craniectomy with residual right sided hemiparesis. (Cook Dep. Ex. 7.) Cook never communicated to UPS any different restrictions or indeed sent any other documents concerning his medical restrictions to UPS. (Truzy Dec. ¶ 6.)

Cook's communications to others outside UPS confirm his physical restrictions. Cook consistently provided medical documentation to Aetna that he had a 20-pound lifting restriction. *See supra* part II.D & n.3. Cook told the Social Security Administration on August 8, 2018, while still on job search leave, that he is impaired in his ability to balance, write, and "pick up and move heavy objects" and specified that he could not lift over 20 pounds. (Cook Dep. Ex. 21 at 1, 8.) Cook also stated to the Social Security Administration on April 22, 2018 that his job as preload supervisor involved lifting packages up to 70 pounds and that he handled big objects three hours per day. (Cook Dep. Ex. 1 at 2.) Cook admitted in his deposition that he is still under a 20 pound lifting restriction. (Cook Dep. 203:1-10.)

Cook admittedly could not lift over 20 pounds and thus was unable to perform all essential functions of the preload supervisor position from the time of his stroke through the end of his employment. He therefore was not a qualified individual with a disability. *See, e.g.*, *Womble Carlyle Sandridge & Rice, LLP*, 616 F. App'x at 595 (where plaintiff was unable to lift the amount required for the position "she was unable to perform an essential function of the job" and thus was not a qualified individual); *Wilson*, 717 F.3d at 346-48 (upholding district court's granting of summary judgment where plaintiff was not a qualified individual).

### 3. Cook did not identify a reasonable accommodation, and there was no reasonable accommodation that would have enabled him to perform the essential lifting requirements of his preload supervisor job.

As Cook could not perform the essential functions of a preload supervisor, he "bears the burden of identifying an accommodation that would allow a qualified individual to perform the job, as well as the ultimate burden of persuasion with respect to demonstrating that such an

PD.31268099.1

accommodation is reasonable." *Shin v. Univ. of Md. Medical Sys. Corp.*, 369 F. App'x 472, 481 (4th Cir. 2010). Cook proposed two accommodations, both of which were not reasonable.

First, Cook requested "assistance with packages over 20 lbs." (Cook Dep. 123:22-125:1, Ex. 12.) Removing the lifting function from Cook's job is not a reasonable accommodation because "[t]he ADA does not require an employer to assign an employee to permanent light duty, nor does it require an employer to reallocate job duties in order to change the essential functions of a job, or hire an additional person to perform an essential function of a disabled employee's position." *Shin*, 369 F. App'x at 482; *see also, e.g.*, *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995) ("reasonable accommodation is by its terms most logically construed as that which presently, or in the immediate future, enables the employee to perform the essential functions of the job in question.")

It is not a reasonable accommodation to shift Cook's physical lifting duties to another employee. (Dep. 153:1-156:21, Ex. 18.) "[T]he ADA does not require an employer to make an accommodation that would impact other employees in their ability to perform their job duties, such as creating more work." *Rudolph*, 846 F. Supp. 2d at 474. *See Womble Carlyle Sandridge & Rice, LLP*, 616 F. App'x at 595 (affirming summary judgment for employer on ADA claims and rejecting proposed accommodation that others perform tasks above 20 pound lifting restriction, holding that "requiring assistance for all tasks that involve lifting more than 20 pounds would reallocate essential functions, which the ADA does not require" (citing 29 C.F.R. pt. 1630 app. § 1630.2(o))).

Cook's proposed accommodation of reassignment to the occupied package data supervisor position is also not reasonable. (Cook Dep. Ex. 12.) To show that a transfer to another position would be a reasonable accommodation, "[p]laintiff bears the burden of

18

demonstrating the existence of 'a **vacant** position for which she was qualified.'" *White v. Buckeye Fire Equip. Co.*, 2018 WL 2304048, at *6 (W.D.N.C May 21, 2018) (emphasis added). The package data supervisor position was indisputably filled in the Wilkesboro facility from March 1, 2007 to May 30, 2020. (Truzy Dec. ¶ 9.) This proposed reassignment was therefore not reasonable. *Fields v. Clifton T. Perkins Hosp.*, 605 F. App'x 200, 201–02 (4th Cir. 2015) (affirming district court's grant of summary judgment where plaintiff "presented insufficient evidence that a vacant position at the [defendant] was available and no evidence that he was qualified for the positions he sought"). Because Cook did not identify a reasonable accommodation, he is not a qualified individual and his claim should be dismissed. *Shin*, 369 F. App'x at 483 (upholding district court's grant of summary judgment where plaintiff failed to identify a reasonable accommodation).[5]

**B.** **Cook is judicially estopped from bringing an ADA claim because he disclaimed any ability to work in his applications for social security benefits and student loan forgiveness.**

Cook and his doctors disclaimed Cook's ability to work in his submissions for social security disability payments and student loan forgiveness. To avoid claim preclusive judicial estoppel, Cook must explain how these statements could be truthful yet he is nonetheless a qualified individual with a disability under the ADA, *i.e.*, how he could have performed all essential job functions with or without accommodation. *Swanson v. Med. Action Indus., Inc.*, 343 F. Supp. 2d 496, 499 (W.D.N.C. 2004) ("[T]hat explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless perform the essential functions of [his] job, with

---

[5] To the extent Cook claims that UPS failed to engage in the interactive process, an employer "cannot be held liable for a failure to engage in the interactive process" where, as here, the employee fails to identify a reasonable accommodation. *Wilson*, 717 F.3d 347-48.

PD.31268099.1

or without reasonable accommodation." (quoting *Fox v. General Motors Corp.*, 247 F.3d 169,

177 (4th Cir. 2001))). As the United States Supreme Court held,

> When faced with a plaintiff's previous sworn statement asserting 'total disability'
> or the like, the court should require an explanation of any apparent inconsistency
> with the necessary elements of an ADA claim. To defeat summary judgment, that
> explanation must be sufficient to warrant a reasonable juror's concluding that,
> assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement,
> the plaintiff could nonetheless 'perform the essential functions' of her job, with or
> without 'reasonable accommodation.'

*Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 807 (1999). "Thus, the Plaintiff is

obligated to offer sufficient explanations 'as to why he was both totally disabled, and so entitled

to [social security] benefits, and a qualified individual with a disability entitled to bring a claim

under the ADA.'" *Swanson*, 343 F. Supp. 2d at 500 (quoting *Fox*, 247 F.3d at 177 (alteration in

original). An employee must explain all inconsistencies in his positions to avoid judicial

estoppel. *See, e.g.*, *Hamilton v. Dayco Prod., LLC*, No. 2:07-2782-PMD-RSC, 2009 WL

335062, at *9 (D.S.C. Feb. 10, 2009) (estopping an ADA claim where "plaintiff has claimed: (1)

that she is completely disabled and unable to work; (2) that she was not completely disabled

when her employment was terminated by Defendants; and (3) that her current condition is

unchanged from her condition when she was put on medical leave by Defendants" because "[a]ll

three of these assertions simply cannot be true.").

Cook first applied for social security disability payments in March 2018, before he

attempted to return to work without following UPS's processes. (Cook Dep. 74:20-75:13 & Ex.

4.) Cook told the Social Security Administration that he was totally disabled and unable to work

starting July 15, 2017, the date of his stroke. (*See* Cook Dep. Ex. 6 ("I became unable to work

because of my disabling condition on July 15, 2017. I am still disabled.")) On April 22, 2018,

Cook explained to Social Security that his previous job of part-time supervisor in logistics

involved "fill[ing] in for employee bathroom breaks by loading and unloading trucks often lifting

packages up to 70 lbs"; that he handled big objects 3 hours per day in this job and that he "lifted packages of varying weight and size … over 100 times per day." (Cook Dep. Ex. 1 at 2.) On September 28, 2018, Cook told Social Security that "my impairments prevent me from working and restrict my activities." (Cook Dep. Ex. 23.) On September 23, 2019, based on Cook's testimony and submissions and the testimony of a vocational expert, the Administrative Law Judge found Cook was unable to work in his former job as a supervisor in logistics and that there were no jobs found in significant numbers that Cook could perform. (Cook. Dep. Ex. 24.) On January 9, 2020, Cook certified that has a "total and permanent disability" in his application for discharge of his student loan debt and his doctor said that he has an impairment that will prevent him from engaging in substantial gainful activity for at least 60 months. (Cook. Dep. Ex. 28.) All of the foregoing statements preceded Cook's filing of this lawsuit in April 2020. (Doc. 1.)

There is no explanation for the material contradictions between Cook's legal claims and his statements to the Social Security Administration and Department of Education. Cook claimed total disability for purposes of social security benefits from the date of his stroke, June 15, 2017, through present, which completely overlaps over the time that Cook claims in this lawsuit to be a qualified individual with a disability. (Cook Dep. 203:1-10; Cook Dep. Ex. 6.)

Cook "must provide a legally adequate explanation; he cannot simply disavow a prior claim of total disability … He must, instead, explain how that earlier assertion of total disability was truthful and yet consistent with the ability to perform the essential functions of the job." *Swanson*, 343 F. Supp. 2d at 500. Cook does not meet that standard through his testimony that he pursued Social Security benefits "[w]ell, basically for some sort of income. I was duly pursuing my job back, which I was losing, it seemed, and also some sort of disability benefit." (Cook Dep. 78:1-8.) Cook "'made a knowing decision … to apply for disability benefits on the

theory that he could not do the work.'" *Swanson*, 343 F. Supp. 2d at 500 (quoting *Devine v. Bd.*

*of Comm'rs of Elkhart County*, 49 F. App'x 57, 61-62 (7th Cir. 2002)).  He made a statement that

he was unable to work as of July 15, 2017, and "[h]e may not now argue that he could in fact

work as of that date, which would render false his statements to the Social Security

Administration."  *Id.*  Accordingly, Cook should be estopped from bringing his ADA and state

law disability discrimination claims in this case.  *See, e.g.*, *Allen v. Michelin N. Am. Inc.*, No.

6:18-CV-791-TMC, 2020 WL 7332907, at *5 (D.S.C. Dec. 14, 2020) (plaintiff judicially

estopped from pursuing ADA discrimination claim where in the plaintiff's "applications for

long-term disability and social security benefits, Plaintiff stated that she was unable to work

beginning as early as January 20, 2017 and remains unable to work, and that such statements

were accepted by … the Social Security Administration").

### C.     UPS terminated Cook after it was unable to accommodate him through reassignment in a six-month job search.

UPS carried its burden to articulate a legitimate, nondiscriminatory reason for terminating

Cook because Cook was administratively terminated when, after the completion of the

interactive process and the six-month job search, no position was found by Cook or UPS within

Cook's geographic preferences and medical restrictions, and Cook had been absent for more than

12 months.  *See, e.g.*, *Howard v. Fenty*, 580 F. Supp. 2d 86, 91 (D.D.C. 2008) (finding defendant

presented a legitimate, non-discriminatory reason for termination where there were no positions

which could accommodate plaintiff); *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214

(4th Cir. 2007) (the employer's burden "is a burden of production, not persuasion.")

As explained above, UPS engaged in the interactive process to determine if Cook could

perform the essential functions of a preload supervisor or other available position with or without

reasonable accommodation.  *See supra* II.D.  After UPS requested and received medical

paperwork from Cook's doctor; held an accommodations meeting giving Cook the opportunity to suggest any accommodations that would allow him to complete the essential functions of his job; and engaged in a six month job search where Cook and UPS searched for available positions he was qualified to perform, UPS and Cook were unable to identify a reasonable accommodation or job within Cook's restrictions, and he was administratively terminated on December 27, 2018.

**D.    There is no evidence that UPS's reason for termination is pretext.**

As UPS articulated a legitimate, nondiscriminatory reason for terminating Cook, the burden shifts back to Cook to show that UPS's decision is pretext.  "[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove 'both that the reason was false, and that discrimination was the real reason.'"  *Adams v. Trustees of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011)).

There is no evidence that UPS terminated Cook for any unlawful reason.  Cook could not be reasonably accommodated due to his medical restrictions after his stroke and seizures, and no position was identified within his geographic preferences and medical restrictions.  There is no record evidence that any employees were treated differently than Cook under similar circumstances.  In addition, Cook admitted that no UPS employee made an inappropriate comment to him about his stroke or seizures.  (Cook Dep. 217:25-218:16.)

Indeed, when Coates spoke to Bailey about the essential functions of the preload supervisor position and open positions at the Wilkesboro facility, Bailey told Coates that Cook was a "good employee" and "wanted to get him back to work" but with his lifting restriction there was no open position for which Cook could complete the essential functions.  (Coates Dep. 51:24-52:9.)  Cook repeatedly confirmed the absence of work within his restrictions to the Social Security Administration and the Department of Education, *i.e.*, that he has a total disability that

started July 15, 2017 that prevents him from working and continues to this day. *See* Cook Dep. Ex. 6, 23, 28.

Cook cannot prove pretext by second-guessing the UPS interactive processes and subsequent six-month job search period that he was afforded. As the Fourth Circuit has held,

> [T]his Court does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination … Our sole concern is whether the reason for which the defendant discharged the plaintiff was discriminatory. Thus, when an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.

*DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998). Cook has no evidence of pretext and his disability discrimination claim fails as a matter of law.

### E. Cook's Wrongful Discharge Claims Necessarily Fail Because His ADA Claim Fails.

Cook also brought claims for wrongful discharge under the NC Equal Employment Practices Act ("NCEEPA") and NC Persons with Disabilities Protection Act ("NCPDPA"). North Carolina is an employment at-will state and the public policy exception to the North Carolina's "employment-at-will doctrine is a 'narrow exception.'" *Roberts v. First-Citizens Bank & Trust Co.*, 124 N.C. App. 713, 721 (N.C. App. 1997) . UPS is entitled to summary judgment on both claims because both arise from the same facts as Cook's ADA claim.

Because Cook's ADA claim fails as matter of law, his claim for wrongful discharge under the NCEEPA necessarily fails. *See, e.g.*, *Hughes v. Bedsole*, 48 F.3d 1376, 1383 (4th Cir. 1995) (stating that the North Carolina Supreme Court "explicitly adopted the Title VII evidentiary standards in evaluating a state claim under" the NCEEPA); *Morris v. Bellsouth Telecomm., Inc.*, 302 F. Supp. 2d 515, 524 (M.D.N.C. 2004) (dismissing plaintiff's NCEEPA claims on same grounds as her Title VII and ADA claims).

Cook's claim for wrongful discharge under the NCPDPA fails because "[t]he NCPDPA bars any action where plaintiff has simultaneously sought relief under … the ADA." *Tompkins v. Charlotte-Mecklenburg Sch. Sys.*, No. 3:16-CV-152-RJC-DSC, 2016 WL 5868086, at *2 (W.D.N.C. Oct. 6, 2016); *Cone ex rel Cone v. Randolph County Sch.*, 302 F. Supp. 2d 500, 514 (M.D.N.C. 2004).

## V.  CONCLUSION

UPS afforded Cook a leave of absence for well over a year, a complete ADA interactive process, and a six-month job search. UPS was not obligated to hold Cook's job open indefinitely, and Cook's employment was lawfully terminated. For the foregoing reasons, Defendant UPS is entitled to summary judgment on all of Plaintiff Earl Cook's claims.

Respectfully submitted,

UNITED PARCEL SERVICE, INC.

By: */s/ Nathan A. Huff*
Nathan A. Huff
NC Bar Number 40626
PHELPS DUNBAR LLP
4140 ParkLake Ave., Suite 100
Raleigh, NC 27612
Telephone: (919) 789-5307
Facsimile: (919) 789-5301
nathan.huff@phelps.com

By  */s/ J Stanton Hill*
Ethan Goemann
North Carolina Bar No. 50731
SEYFARTH SHAW LLP
121 West Trade Street, Suite 2020
Charlotte, North Carolina 28202
Telephone: (704) 925-6026
Facsimile: (704) 946-6083
E-mail: egoemann@seyfarth.com

J Stanton Hill (*pro hac vice* admission)
Seyfarth Shaw LLP
1075 Peachtree St NE, Suite 2500

25

Atlanta, GA 30309
Telephone: (404) 885-1500
Facsimile: (404) 892-7056
shill@seyfarth.com

*Attorneys for Defendant*

Date: March 1, 2021

PD.31268099.1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
Case No. 5:20-cv-00042-KDB-DSC

EARL COOK,

        Plaintiff,

v.

UNITED PARCEL SERVICE, INC.,

        Defendant.

_____

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2021, I filed a true and correct copy of DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the following attorneys of record:

        Todd J. Combs
        Combs Law, PLLC
        1965 Mecklenburg Highway
        Mooresville, North Carolina  28115

        */s/ J Stanton Hill*_____
        Counsel for Defendant

27