# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## STATESVILLE DIVISION
## CIVIL ACTION NO. 5:20-CV-00042-KDB-DSC

| | |
|---|---|
| **EARL COOK,** | |
| **Plaintiff,** | |
| **v.** | **ORDER** |
| **UNITED PARCEL SERVICE, INC.,** | |
| **Defendant.** | |

**THIS MATTER** is before the Court on Defendant United Parcel Service, Inc.'s ("Defendant" or "UPS") Motion for Summary Judgment. (Doc. No. 18). The Court has carefully considered the Motion, the corresponding briefs and exhibits, as well as the parties' oral arguments on May 24, 2021. Plaintiff Earl Cook ("Cook") brings claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*. and related state statutes. Because Cook is not a qualified individual under the ADA (as further explained below), the Court will **GRANT** Defendant's Motion for Summary Judgment.

## I.    BACKGROUND

Cook began working for UPS as a preloader in the company's Wilkesboro, North Carolina facility on September 30, 2014. (Doc. No. 24-2, ¶ 5). As a preloader, Cook was responsible for picking up packages from a belt and placing the packages onto trucks. (Doc. No. 18-3, at 5-7). Preloaders are expected to lift packages up to 70 pounds without assistance and frequently lifted packages over 20 pounds. *Id.* at 6 (lifting up to 70 pounds); *id.* at 7 (estimating a third of the approximately 700 packages loaders lifted on a daily basis weighed over 20 pounds).

On January 5, 2015, Cook was promoted to part-time preload supervisor. (Doc. No. 24-2, ¶ 6). As a preload supervisor, Cook was responsible for supervising 11 employees, including 8 loaders. (Doc. No. 18-3, at 13). UPS's written job description for preload supervisors requires supervisors to be able to lift, carry, and pull up to 70 pounds. (Doc. No. 18-3, at 158).

On July 15, 2017, while at home, Cook suffered a hemorrhagic stroke. (Doc. No. 24-2, ¶ 7). He was taken to Wilkesboro Regional Hospital and soon after airlifted to Baptist Hospital in Winston-Salem, where he remained until August 22, 2017. *Id.*; (Doc. No. 18-3, at 26). To relieve swelling, doctors drilled a hole and removed part of his skull in October 2017. (Doc. No. 18-3, at 26).

Since the stroke, Cook has suffered from four intermittent seizures. (Doc. No. 18-3, at 29). His first seizure occurred on February 28, 2018 while he was at home. The seizure caused him to fall out of his chair and lose consciousness. *Id.* at 27-28. Another seizure occurred on July 4, 2018 while Cook was at a church cookout. *Id.* at 70. He recalls standing in line, feeling "something weird," and then waking up in the hospital. *Id.* Cook's most recent seizure occurred in late 2019 or early 2020 while he was at home using his computer. *Id.* at 29.

Cook was approved for leave under the Family Medical Leave Act ("FMLA") from July 15, 2017 to October 9, 2017 (Doc. No. 18-6, ¶ 4) and for paid disability benefits from July 15, 2017 to January 12, 2018, *id.* ¶ 5. A second short-term disability claim was approved for benefits beginning on January 13, 2018. *Id.* ¶ 5; (Doc. No. 18-3, at 151).

On April 3, 2018, Cook received a letter from the UPS Human Resources Service Center informing him about his options to return to work. (Doc. No. 18-3, at 135). The letter reminded Cook that UPS offers job-related accommodations for persons who are disabled within the meaning of the ADA and that if Cook believed he had an ADA-covered disability and was

interested in requesting an ADA accommodation, he was to contact the UPS Human Resources Service Center to obtain the necessary paperwork. *Id.* Cook was also informed of the UPS Flexible Benefits Summary Plan Description, which provides that employees who are absent from their regular occupation for 12 months, including time periods spent on a personal leave or performing a residual disability assignment, will be administratively terminated regardless of their status on short- or long-term disability. *Id.*

On April 4, 2018, Cook visited his doctor who gave him a release to return to work with the following restrictions for at least the next six months: no lifting over 25 pounds, no driving, and a 10-minute break every two to two-and-a-half hours. (Doc. No. 18-3, at 205). After visiting his doctor, Cook took the work release paperwork to Chuck Ford and mentioned to Ford that he planned to come back the next day.[1] (Doc. No. 18-3, at 42). On April 5, 2018, Cook returned to the Wilkesboro facility with the intention of regaining his employment.[2] (Doc. No. 18-3, at 38, 42). Other than giving Ford the doctor's note, Cook did not communicate his work restrictions to anyone else at UPS. (Doc. No. 18-3, at 45).

Nancy Bailey, the manager of the Wilkesboro facility, called On-Road Supervisor Mickey Wall the morning of April 5, 2018 to check in on the Wilkesboro facility. (Doc. No. 18-4, at 3). Wall informed Bailey that Cook had returned to work and relayed the restrictions listed in Cook's

---

[1] UPS records show that Chuck Ford was terminated in January 2018 and did not work at UPS in April 2018. (Doc. No. 18-6, ¶ 8). Nevertheless, Cook insists that he saw Ford on April 4, 2018 and gave him his work release paperwork. (Doc. No. 18-3, at 55-56); *see also* (Doc. No. 18-4, at 4) (Nancy Bailey, manager of the Wilkesboro facility, stating that she believed "Chuck was on vacation" the week of April 5, 2018). Whether or not Ford was working at UPS at the time is not material to the summary judgment motion before the Court.

[2] During his deposition, Cook stated that he received a letter from Aetna stating that his benefits would expire on April 4, 2018, which is likely why he decided to show up for work on this date. (Doc. No. 24-2, at 1). However, the letter merely stated that UPS's Personal Medical Leave would expire on April 4, 2018. Cook was covered by other benefits after April 4, 2018.

doctor's note. *Id.* at 4. Bailey told Wall that Cook could not work because of his 25-pound weight restriction. *Id.* at 5. Cook recalls receiving a phone call from Bailey, during which she told him that he could not work until he was 100% and he would not get paid for his work on April 5. (Doc. No. 24-1, at 2). It was Bailey's understanding that Cook stopped working shortly after her conversation with Wall, *id.*, however, Cook did not leave and continued to work for the rest of the workday, (Doc. No. 18-3, at 44). Cook never returned to the Wilkesboro facility to work after April 5, 2018. *Id.*

On April 11, 2018, Cook initiated an accommodation request with UPS. (Doc. No. 18-6, ¶ 6). UPS sent Cook a request for medical information to be completed by his doctor. *Id.* The only medical documentation UPS received from Cook was a completed Request for Medical Information filled out by Dr. Taylor Norman dated April 19, 2018. *Id.*; (Doc. No. 18-3, at 47-48). The completed form stated that Cook was currently unable to perform all of the functions of his position, that he was unable to "lift/carry/pull greater than 20 lbs," and "unable to climb ladder, bend/squat repetitively." (Doc. No. 18-3, at 139). Dr. Norman also indicated that Cook's weight and activity restrictions were "of unknown permanence at this time," as Cook continued to recover from his stroke. *Id.* at 140.

On May 15, 2018, UPS held an ADA "checklist meeting" with Cook. (Doc. No. 18-3, at 60, 152-158). UPS Human Resources Manager Kendra Coates and Occupational Health Supervisor Sharon Klinger attended the meeting on behalf of UPS. (Doc. No. 18-3, at 59). Cook's girlfriend, Larisa Ashe, also attended the meeting and filled out the checklist form on Cook's behalf because Cook had not learned how to write left-handed as effectively as he would have liked. *Id.* at 59-60. On the checklist form, Cook had Ashe write that he was unable to lift, carry, or pull more than 20 pounds and unable to climb ladders, bend, or squat repetitively. *Id.* at 152. When Cook was asked

to describe any accommodations that he believed would permit him to be able to perform the essential functions of his preload supervisor job, he wrote "a job working downstairs and assistance with packages over 20 lbs." *Id.* When asked to identify any other jobs at UPS for which he believed he could perform the essential functions, Cook wrote "management position that functions before operation begins early morning." *Id.* He further indicated that he wanted to stay within the Wilkesboro facility. *Id.* at 153.

Coates also filled out portions of the checklist form on behalf of UPS. *Id.* at 154-56. She indicated "none" under "Employee Proposed Accommodations (In Current Job)"[3] and identified "PT [part-time] Package Data Supervisor" under "Employee Proposed Accommodations (Transfer or Reassignment)." *Id.* For the Package Data Supervisor position, Coates indicated that a position was not available. The sole part-time Package Data Supervisor position at the Wilkesboro facility was filled by David Massucco from March 1, 2007 to May 30, 2020. (Doc. No. 18-6, ¶ 9). She also indicated that Cook possessed the requisite education, skills and experience for the position, but was not capable of performing the essential job functions of the position because he would have to climb to use the computer and lift packages in the absence of other management employees during the prescribed hours. *Id.* at 155.

On June 14, 2018, Coates emailed Cook informing him that she was unaware of any available position at UPS at that time for which Cook was qualified and capable of performing the essential job functions with or without reasonable accommodation. (Doc. No. 18-3, at 159). Cook's leave was extended for six months to afford UPS and Cook time to look for an available position at UPS

---

[3] Although Coates wrote "none," Cook did in fact propose two accommodations: (1) to use a downstairs computer instead of an upstairs computer; and (2) assistance with packages over 20 pounds. Coates does not dispute this, and when discussing the form during her deposition she said she did not know why she put down "none." (Doc. No. 24-11, at 1).

that Cook could perform. *Id.* Coates's replacement as of July 2018, HR Manager Ebony Truzy, also looked for open positions in the Wilkesboro facility for Cook during this period. (Doc. No. 18-6, ¶ 11). No positions were found, and Cook's employment was administratively terminated on December 27, 2018 after he had been absent from work for more than 12 months. (Doc. No. 18-3, at 206).

Cook filed an application for social security disability benefits on March 9, 2018. (Doc. No. 18-3, at 123-134). In his application, he claimed that he had been unable to work since July 15, 2017, the date he suffered his stroke. *Id.* at 125. As part of his application, he filled out a "Work History Report" in which he described his daily tasks for each job. (Doc. No. 18-3, at 115-122). To describe his preloader supervisor position, Cook wrote: "supervise, fill out paperwork, use computer to check reports. Had to fill in for employee bathroom breaks by loading and unloading trucks often lifting packages up to 70 lbs." *Id.* at 116. Under "Lifting and Carrying," Cook described his preloader supervisor position as "lift[ing] packages of varying weight and size. . . . Over 100 times per day." *Id.* Cook submitted various medical records in support of his social security disability benefits application; they all confirmed a weight restriction and other physical restrictions as a result of Cook's stroke. After a favorable decision from an Administrative Law Judge, Cook was awarded monthly social security payments that continued through the date of his deposition in January 2021. (Doc. No. 18-3, at 98). In 2020, Cook also applied for discharge of his student loans on the basis of total and permanent disability. His application was successful and his student loans were discharged. (Doc. No. 18-3, at 199-200).

On September 7, 2018, before Cook was administratively terminated, he filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) contending that UPS violated ADA, 42 U.S.C. § 12101 *et seq.* (Doc. No. 1-2). On January 17, 2020, the EEOC

informed Cook it was closing its file on his charge because it was unable to conclude that the information obtained established any violations of the statutes after its investigation. (Doc. No. 1-1). On April 2, 2020, Cook timely filed a Complaint against UPS in this Court. (Doc. No. 1). The Complaint alleges that UPS failed to make reasonable accommodations for Cook's disability and that UPS violated the North Carolina Equal Employment Practices Act, N.C.G.S. § 143-422.1, *et. seq.*, and the North Carolina Persons with Disabilities Protection Act, N.C.G.S. § 168A-5-11, *et. seq*., in terminating him and failing to make reasonable accommodations for his disability. UPS has now moved for summary judgment on all claims.

## II.    LEGAL STANDARD

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A factual dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if it might affect the outcome of the suit under the governing law." *Vannoy v. Federal Reserve Bank of Richmond*, 827 F.3d 296, 300 (4th Cir. 2016) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact through citations to the pleadings, depositions, answers to interrogatories, admissions or affidavits in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). "The burden on the moving party may be discharged by 'showing' . . . an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing

that there is a genuine issue for trial." *Id*. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. *Id*. at 324.

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014); *see also Anderson*, 477 U.S. at 255. "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015) (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed. 1998)). "The court therefore cannot weigh the evidence or make credibility determinations." *Id*. at 569 (citing *Mercantile Peninsula Bank v. French* (*In re French*), 499 F.3d 345, 352 (4th Cir. 2007)).

However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal citations omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Also, the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *Id*. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Id*. at 249-50.

In the end, the question posed by a summary judgment motion is whether the evidence as applied to the governing legal rules "is so one-sided that one party must prevail as a matter of law." *Id*. at 252.

## III.    DISCUSSION

*A.  Failure to Accommodate under the ADA*

"The Americans with Disabilities Act requires employers to make reasonable accommodations to 'the known physical or mental limitations of an otherwise qualified [employee] with a disability.'" *Wirtes v. City of Newport News*, __ F.3d __, No. 19-1780 (4th Cir. Apr. 30, 2021) (quoting *Laird v. Fairfax Cnty.*, 978 F.3d 887, 892 (4th Cir. 2020)). An employee is qualified if they "can perform the essential functions of the employment position [they] hold[] or desire[]," either "with or without reasonable accommodation." *Laird*, 978 F.3d at 892 n.2 (quoting 42 U.S.C. § 12111(8)).

For purposes of the ADA, "reasonable accommodations" may consist of "job restructuring, part-time or modified work schedules, reassignment to a vacant position, [and] acquisition or modification of equipment or devices, . . . ." 42 U.S.C. § 12111(9)(B); *see also* C.F.R. § 1630.2(o)(1)(ii). While "reallocating or redistributing nonessential, marginal job functions" may be reasonable accommodation, 29 C.F.R. pt. 1630 app. § 1630.2(o), an accommodation is not reasonable under the ADA if it "reallocate[s] essential functions," *id.*; *E.E.O.C. v. Womble Carlyle Sandridge & Rice, LLP*, 616 F. App'x 588, 593 (4th Cir. 2015).

Therefore, "in order for a plaintiff to establish a prima facie case against his employer for failure to accommodate under the ADA, the plaintiff must show: '(1) that he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position; and (4) that the employer refused to make such accommodations.'" *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (quoting *Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001)); *see also Hannah P. v. Coats*, 916 F.3d 327, 337 (4th Cir. 2019).

Here, the parties do not dispute elements one and two of Cook's prima facie case—that is, (1) he has a disability within the meaning of the statute, and (2) UPS was on notice of his disability. Rather, this motion turns on the third and fourth elements: whether there are genuine issues of material fact as to whether Cook was a qualified individual under the ADA, such that had he been given a reasonable accommodation, he could have "performed the essential functions of the employment position," and whether UPS refused to make such accommodations. 42 U.S.C. § 12111(8).

To determine if Cook was a qualified individual for the preload supervisor position, the Court must decide (1) whether Cook could "perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue," and (2) if not, whether "any reasonable accommodation by the employer would enable [him] to perform those functions." *Tyndall v. National Educ. Ctrs., Inc.*, 31 F.3d 208, 213 (4th Cir. 1994) (citing *Chandler v. City of Dallas*, 2 F.3d 1385, 1393-94 (5th Cir. 1993)). Cook bears the burden of demonstrating that he could perform the essential functions of his job with reasonable accommodation. *Id.*

"Not all job requirements or functions are essential." *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 579 (4th Cir. 2015). A job function is essential when the reason the position exists is to perform that function, when there are not enough employees available to perform the function, or when the function is so specialized that someone is hired specifically because of his or her expertise in performing that function. 29 C.F.R. § 1630.2(n)(2); *see also Jacobs*, 780 F.3d at 579. "[I]f an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). Other relevant evidence can include "the employer's judgment as to which functions are essential," "the amount of time spent on the job performing

the function," "the consequences of not requiring the incumbent to perform the function," and the work experience of people who hold the same or similar job. 29 C.F.R. § 1630.2(n)(3).

The Court begins with the written job description for the position.[4] UPS's description of the preload supervisor position includes heavy lifting, such as "assist[ing] in moving packages weighing up to 150 pounds." (Doc. No. 18-3, at 147). It also includes "occasional" lifting, carrying, and pushing or pulling of up to 70 pounds. (Doc. No. 18-3, at 146). "Occasional" is classified as 1% to 33% of the time. *Id.* In UPS's judgment, lifting more than 20-25 pounds was essential because multiple preload supervisor tasks may involve heavy lifting, especially when conducting annual safety trainings for preloaders where supervisors demonstrate how to properly lift boxes and when supervisors are required to assist preloaders if they fall behind schedule. (Doc. No. 18-4, at 7-8).[5]

The Court also considers the undisputed evidence in the record to determine whether lifting over 20-25 pounds is an essential function of the preload supervisor position. Cook's experience as a preload supervisor and his prior testimony to the Social Security Administration ("SSA") confirm that lifting more than 20-25 pounds is an essential function of the job. Cook testified in his deposition that during his time as a preload supervisor he would often have to move packages, including when a package was blocking the conveyor belt and needed to be moved (Doc. No. 18-3, at 9 (testifying he would do this a "couple of times a day")); when packages were damaged and

---

[4] There is some dispute over when this job description was created. Cook testified that he had not seen the list of job functions for the preload supervisor position before his stroke, but whether or not Cook *saw* the list of functions has little to do with whether the job functions actually existed and whether or not they were essential. At the hearing, Cook was unable to dispute that the job description existed at the time of his stroke (he could only say he never saw the job description until this lawsuit). UPS's written description is highly probative of its view of what functions are essential to the preload supervisor position.

[5] Although the job description discusses lifting 70 pounds, the more pertinent inquiry is whether the job required lifting more than 20-25 pounds because that was Cook's lifting limit.

he would, as the preload supervisor, remove the damaged box and either move it to another area or remove the damaged items and repackage the box himself (Doc. No. 18-3, at 14, 22); when the loading rate fell behind or the facility was short staffed and he would step in as the supervisor to help load packages for the entire day to ensure the trucks got out on time (Doc. No. 18-3, at 112-13); and when training new loaders.

Moreover, Cook's Work History Report for the Social Security Administration provides additional evidence of his essential job functions. In the report, Cook stated that as a preload supervisor he was required to "fill in for employee bathroom breaks by loading and unloading trucks often lifting packages up to 70 lbs." (Doc. No. 18-3, at 116). He also wrote that he "[l]ifted packages of varying weight and size" and "[c]arried between 1ft and 30ft over 100 times per day." *Id.*

Cook argues that lifting over 20-25 pounds is not an essential function of the preload supervisor position because it would violate the National Master United Parcel Service Collective Bargaining Agreement between UPS and the International Brotherhood of Teamsters ("IBT Agreement"). (Doc. No. 24-1, at 3). In Cook's view, the IBT Agreement mandates that supervisors not move packages that are the responsibility of the preloaders. *Id.* However, the IBT Agreement merely ensures that supervisors are not *taking away* work from loaders by doing work for the loaders when there are loaders available to do the work. (Doc. No. 24-8, at 13) ("The Employer agrees that the function of the supervisors is the supervision of Employees and not the performance of the work of the employees they supervise."). It does not define the job duties or essential functions of a preload supervisor, nor does it prohibit supervisors from lifting packages. By its plain terms, the IBT Agreement recognizes that there are times where the supervisor will need to lift packages. *Id.* ("Accordingly, the employer agrees that supervisor or other employees of the employer who are

not members of the bargaining unit shall not perform any bargaining unit work, except to train employees or demonstrate safety, or as otherwise provided in the applicable supplement, rider or addendum."); *see also* (Doc. No. 24-5, at 6-7).

As evidenced from the record, a preload supervisor who could not lift over 20-25 pounds would require help with multiple tasks. Even if preload supervisors are not required to lift heavy packages frequently, a function may still be essential even if infrequent. *See* 29 C.F.R. Part 1630, App. § 1630.2(n) ("For example, although a firefighter may not regularly have to carry an unconscious adult out of a burning building, the consequence of failing to require the firefighter to be able to perform this function would be serious."). Here, there would be significant consequences of not requiring a preload supervisor to be able to lift packages over 20-25 pounds, including, amongst others, potentially falling behind in the loading rate.[6] Lifting packages over 20-25 pounds bears more than a "marginal relationship" to the preload supervisor position. Therefore, lifting more than 20-25 pounds is an essential function of preload supervisors. *See EEOC v. Womble Carlyle Sandridge & Rice, LLP*, No. 1:13CV46, 2014 WL 2916851, at *4-7 (M.D.N.C. June 26, 2014) (analyzing whether heavy lifting was an essential function of a position, finding that it was, and holding that plaintiff was unable to perform an essential function of the job because she could not lift the amount required and was, therefore, not a qualified individual), aff'd 616 F. App'x 558 (4th Cir. 2015).

---

[6] Additionally, there would likely be serious safety concerns in not requiring a preload supervisor to be able to lift over 20-25 pounds. For instance, if someone was caught in the conveyor belt (as Cook reported happened once) a preload supervisor may need to help pull or lift the man out of the conveyor belt. Cook's weight limitation would prevent him from doing so (or at least doing so effectively).

Having established that lifting more than 20-25 pounds is an essential function and there being no genuine dispute that Cook could not lift more than 20-25 pounds,[7] the Court now turns to the question of whether, with a reasonable accommodation, Cook could perform the essential functions of the position of preload supervisor. This inquiry proceeds in two steps: (1) were the specific accommodations requested by Cook reasonable; and (2) had UPS granted the accommodation, could Cook perform the essential functions of the position.

Cook's requested accommodations as set forth in the ADA Accommodations Checklist were (1) a job working downstairs and (2) assistance with packages over 20 pounds. (Doc. No. 18-3, at 152). Requiring assistance with packages over 20 pounds is not a reasonable accommodation because it would shift Cook's lifting duties to another employee. "The ADA does not require an employer to make an accommodation that would impact other employees in their ability to perform their job duties, such as creating more work." *Rudolph v. Buncombe County Government*, 846 F. Supp. 2d 461, 474 (W.D.N.C. 2012). Requiring another employee to assist Cook in lifting packages over 20-25 pounds is not a reasonable accommodation because doing so would require that another person perform an essential function of the employee's job. *See Womble Carlyle*, 2014 WL 2916851, at *7; *see also Peters v. City of Mauston*, 311 F.3d 835, 840 (7th Cir. 2002) (upholding summary judgment against an equipment operator who suffered a shoulder injury and was no longer able to lift or carry anything over fifty pounds and finding that the employee's request for a helper was unreasonable because lifting and carrying were essential functions of his job as an equipment operator and making such accommodation would have required another

---

[7] Cook claims that his weight restriction is temporary, but he was still under the weight restriction at the time of the hearing on May 24, 2021 and gave no indication of when the weight restriction may change. Notably, Cook's doctor wrote that Cook's weight restriction was of "unknown permanence," (Doc. No. 18-3, at 47-49, 140), and, at his deposition in January 2021, Cook merely stated that he "hoped" they would change. (Doc. No. 18-3, at 105).

person to perform an essential function of the employee's job); *Shin v. Univ. of Md. Med. Sys. Corp.*, 369 F. App'x 472, 782 (4th Cir. 2010) ("The ADA does not require an employer to assign an employee to permanent light duty, nor does it require an employer to reallocate job duties in order to change the essential function of a job, or hire an additional person to perform an essential function of a disabled employee's position."). Cook's request to work downstairs referred to his use of a downstairs computer instead of the upstairs computer he had been using as a preload supervisor. However, it does not relate to Cook's ability to lift over 20-25 pounds. Thus, the Court need not address whether or not his request to work downstairs was a reasonable accommodation because even if Cook were permitted to work downstairs, he would still be unable to perform the essential function of lifting more than 20-25 pounds.

Cook also requested reassignment to a management position in the Wilkesboro facility, namely the package data supervisor position. "Plaintiff bears the burden of demonstrating the existence of 'a vacant position for which [he] was qualified.'" *White v. Buckeye Fire Equipment Company*, No. 3:17CV404-MOC-DSC, 2018 WL 2304048, at *5 (W.D.N.C. May 21, 2018) (quoting *Nartey-Nolan v. Siemens Meds. Sols. USA, Inc.*, 91 F. Supp. 3d 770, 775 (E.D.N.C. 2015)). The package data supervisor position at the Wilkesboro facility was filled from March 1, 2007 to May 30, 2020. (Doc. No. 18-6, at 2, ¶ 9). In the absence of an open position, Cook cannot avoid summary judgment based on UPS's failure to put him in his requested alternate employment.

Cook also suggests that UPS did not engage in the interactive ADA process in good faith; however, he points to no evidence in the record of a lack of good faith. On the contrary, Cook engaged in a meeting with UPS and HR officials during which he filled out the ADA accommodations checklist and made his specific accommodation requests. UPS then provided another six months for Cook and the company to look for another job Cook could perform at UPS.

Cook did not apply for any jobs and UPS found no open positions at the Wilkesboro facility that Cook could perform. Cook's mere disagreement or discontentment with UPS's actions does not create an inference, much less proof, of bad faith by UPS.

In sum, because Cook could not perform an essential function of the job with or without accommodation, he is not a qualified individual under the ADA and his claim for failure to accommodate should be dismissed.

### B. Wrongful Termination Claim under the ADA

In addition to his failure to accommodate claim, Plaintiff asserts a wrongful termination claim under the ADA. (Doc. No. 24-1, at 11). To establish this claim, Cook must show "(1) that [he] has a disability, (2) that [he] is a 'qualified individual' for the employment in question, and (3) that [his employer] discharged [him] (or took other adverse employment action) because of [his] disability." *Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 377 (4th Cir. 2000). "Disability discrimination may be proven through direct and indirect evidence or through the *McDonnell Douglas* burden-shifting framework." *Jacobs*, 780 F.3d at 572.

First, this claim fails because Cook is not a qualified individual under the ADA (as explained above). His claim also fails because he has not shown that UPS's proffered legitimate, nondiscriminatory reason for terminating him was pretextual. UPS engaged in an interactive ADA process to see if Cook could perform the essential functions of the preload supervisor position. When UPS determined that Cook could not perform the essential functions of the position with or without reasonable accommodations, Cook was terminated after UPS and Cook failed to find a position within Cook's geographical preferences and medical restrictions and because Cook had been absent for more than 12 months. Cook has offered nothing to rebut UPS's reason for termination except to argue that Cook was able to carry out the essential functions of his preload

supervisor position, which as discussed above, the Court finds Cook was undisputedly unable to do.

C. *Judicial Estoppel*

Alternatively, UPS argues that Cook should be judicially estopped from asserting that he was a qualified individual with a disability because he represented to the SSA and the Department of Education that he was unable to work. "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position . . . ." *Davis v. Wakelee*, 156 U.S. 680, 689 (1895). The purpose of the doctrine of judicial estoppel is "'to protect the integrity of the judicial process' by 'prohibiting parties from deliberately changing positions according to the exigencies of the moment.'" *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 (6th Cir. 1982)). Judicial estoppel "is an equitable doctrine invoked by a court at its discretion." *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990).

Regarding an application for social security benefits, the Fourth Circuit has held:

> The mere act of applying for disability benefits does not estop a plaintiff from making a subsequent ADA claim. *See EEOC v. Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 378 (4th Cir. 2000). In an analogous case, in which the plaintiff in an ADA action had applied for, and received, Social Security Disability Insurance (SSDI), the Supreme Court recently held that "despite the appearance of conflict that arises from the language of the two statutes, the two claims do not inherently conflict to the point where courts should" presume that "the claimant or recipient of . . . benefits is judicially estopped from asserting that he is a qualified individual with a disability." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 800-802 (1999) (internal quotation marks omitted). This is so because the two statutes "pursue different statutory purposes and require different, though related, inquiries into an individual's disability." *Feldman v. Am. Mem'l Life Ins. Co.*, 196 F.3d 783, 790 (7th Cir. 1999). For example, the ADA considers a plaintiff to be a qualified individual with a disability if he is able to perform the job in question with reasonable accommodation, whereas other statutes, like the Social Security Act, do not consider the possibility of reasonable accommodation when determining whether a claimant is disabled. *See Cleveland*, 526 U.S. at 803.

However, because of the possibility of inconsistency, to avoid summary judgment, an ADA plaintiff who is shown to have claimed total disability in the context of another statutory scheme "is required to proffer a sufficient explanation for any apparent contradiction between the two claims." *Stowe-Pharr*, 216 F.3d at 378. "[T]hat explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless perform the essential functions of her job, with or without reasonable accommodation." *Cleveland*, 526 U.S. at 807 (internal quotation marks omitted).

*Fox v. Gen. Motors Corp.*, 247 F.3d 167, 177 (4th Cir. 2001). Thus, for Cook to survive summary judgment, he must offer a sufficient explanation "as to why he was both totally disabled, and so entitled to [social security] benefits, and a qualified individual with a disability entitled to bring a claim under the ADA." *Fox*, 247 F.3d at 178.

In *Rossum v. Baltimore County Maryland*, 178 F. Supp. 3d 292, 299 (D. Md. 2016), the court found that the plaintiff provided a sufficient explanation as to why she applied for SSA benefits when she claimed that she knew her employer was forcing her out of her position and she would thereby lose her retirement, which caused stress that exacerbated her symptoms so greatly it became difficult for her to work. In *Fox v. General Motors Corp.*, the Fourth Circuit found that plaintiff provided two sufficient reasons for the apparent inconsistency in applying for SSA benefits and pursuing an ADA claim: (1) the plaintiff's claims did not overlap temporally, as he requested benefits for only the time after he left his place of employment; and (2) the plaintiff produced evidence that he could have, and would have, continued to work with reasonable accommodation but for the hostile work environment to which he was subjected to at his place of employment. Further, the plaintiff in *Fox* provided evidence that had his supervisors not required him to perform tasks that aggravated his back and not subjected him to constant harassment, which only increased his back injury, he could have continued to work. 247 F.3d at 178. In *EEOC v. Stowe-Pharr Mills, Inc.*, 216 F.3d at 379, the plaintiff testified that she repeatedly told SSA that

she could work with a reasonable accommodation. However, SSA officers advised her to put down her onset date as the date she initially took leave from her job. The Fourth Circuit held that her explanation that she could continue to work with reasonable accommodation was a sufficient explanation for a reasonable jury to conclude that her SSA statements did not contradict her assertion that she could have continued to work if her employer had accommodated her. *Id.*

Cook's situation is distinguishable from these examples. Unlike the plaintiff in *Rossum*, Cook never alleged any deterioration in his medical condition that prompted him to apply for SSA benefits. Unlike the plaintiff in *Fox*, Cook alleged an onset date of July 15, 2017, the date of his stroke, which means that he represented to the SSA that he was under a complete disability and unable to work from July 15, 2017 onwards. The plaintiff in *Stowe-Pharr Mills* applied for disability only after her termination and attempts at receiving reasonable accommodations. Cook, however, applied for social security benefits on March 9, 2018, almost a month before he attempted to return to work on April 5, 2018 and before he ever requested any accommodations. (Doc. No. 18-3, at 35, 123, 198). Also, the plaintiff in *Stowe-Pharr Mills* maintained from the beginning of her SSA application process that she could work with a reasonable accommodation. Cook did not do the same. When asked why he pursued social security benefits, Cook responded: "Well, basically for some sort of income. I was duly pursuing my job back, which I was losing, it seemed, and also some sort of disability benefit." (Doc. No. 18-3, at 36).

As the cases discussed above demonstrate, it can be difficult to apply the doctrine of judicial estoppel in these circumstances. While the Court questions the sufficiency of Cook's explanation, it need not reach UPS's judicial estoppel argument since the Court has already found that Cook was not a qualified individual on other grounds. Nonetheless, at minimum, Cook's

statements to the SSA show that he did have to lift packages up to 70 pounds as a preload supervisor and that he was unable to perform that function of the job since July 15, 2017.

### D. Wrongful Discharge Claims (NCEEPA and NCPDPA)

Cook next contends that UPS violated the NCEEPA by failing to make reasonable accommodations to his disability and by terminating him. The NCEEPA standards for liability follow the standards established in the federal Rehabilitation Act of 1973 and adopted in the ADA. *See, e.g.*, *Hughes v. Dedsole*, 48 F.3d 1376, 1383 (4th Cir. 1995). Accordingly, for the reasons set forth in the Court's analysis of Cook's ADA claims, Cook's NCEEPA claims must also fail.[8]

Lastly, as for Plaintiff's NCPDPA claim, the NCPDPA creates a cause of action for a person with a disability who is aggrieved by a discriminatory practice as defined in the act. N.C. Gen. Stat. § 168A-11(A). Claims under the NCPDPA, however, are limited in that

> [n]o court shall have jurisdiction over an action filed under this Chapter where the plaintiff has commenced federal judicial or administrative proceedings under Section 503 or Section 504 of the Vocational Rehabilitation Act of 1973 . . . or the Americans with Disabilities Act of 1990 . . . involving or arising out of the facts and circumstances involved in the alleged discriminatory practice under this Chapter.

N.C. Gen. Stat. § 168A-11(c); *Cone ex rel Cone v. Randolph County Sch.*, 302 F. Supp. 2d 500, 514 (M.D.N.C. 2004). Here, Cook's claim under the NCPDPA arises out of the same facts and circumstances as his ADA claim, and as such Cook's NCPDPA claim fails as a matter of law. Moreover, with the dismissal of Cook's ADA claims, the Court lacks subject matter jurisdiction over his pendant state claims, which are before the Court only because of the Court's federal question jurisdiction pursuant to 28 U.S.C § 1331.

### IV.    ORDER

---

[8] The parties agree that Cook's claims under the NCEEPA rise and fall with his ADA claim. (Doc. Nos. 18-1, at 24; 24-1, at 25).

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment, (Doc. No. 18), is **GRANTED** as to all claims. The Clerk of Court is directed to close this case.

**SO ORDERED**.

Signed: May 25, 2021

Kenneth D. Bell
United States District Judge